CONSTANTINE & PICKERING S. S. CO. v. AUCHINCLOSS et al. (two cases).

McLEAN et al. v. SAME.

(Circuit Court of Appeals, Second Circuit.    May 22, 1908.)

(Nos. 234–236.)

SHIPPING — DEMURRAGE — CONSTRUCTION OF CHARTER PARTY — "LOADING BERTH."

Charter parties required the vessel in each case to load a cargo of phosphate at Port Inglis, Fla., and provided that the vessel should proceed to the Port Inglis anchorage, "or as near thereunto as she may safely get, and there load. * * * The cargo to be brought alongside

and taken from alongside free of risk and expense to the vessel, any custom of the port to the contrary notwithstanding. * * * Steamer or vessel to proceed to safe anchorage at port of loading indicated by the merchant and there load." Also: "The cargo to be supplied at the average rate of not less than 400 tons per weather working day, * * * commencing 24 hours after vessel is in loading berth and is ready to receive cargo and written notice given to that effect." Vessels were obliged to load at such port some miles from shore, and the government had established there two loading buoys. Three vessels were ordered to proceed to the port at the same time, and they reached there and anchored, and gave notice that they were ready to load. *Held,* that the "loading berth" referred to in the charter was the "safe anchorage" spoken of in the prior clause; that, having reached such anchorage and given the required notice, the lay days commenced, and the charterer could not require the vessels to await their turn at the loading buoys before the time commenced, even though that may have been the custom of the port, nor avoid liability for demurrage because of their detention for two or three weeks beyond the time, either because they could not get to the buoys or because they could not, perhaps, have been fully loaded where they lay—its duty being to load them there, so far as could be safely done, and then permit them to move further out for its completion.

[Ed. Note.—Demurrage, see notes to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 4€ C. C. A. 4.]

Appeal from the District Court of the United States for the Southern District of New York.

The final decrees of the District Court awarded demurrage, amounting in the aggregate to $7,390.65, to the libelants for the detention of their steamships Queenswood, Homewood, and Moness at Port Inglis, Fla., in the winter of 1905–06.

Miller, King, Lane & Trafford (Benjamin A. Morton and William S. Montgomery, of counsel), for appellant.

J. Parker Kirlin and Orville C. Sanborn, for appellees.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

COXE, Circuit Judge. The judge of the District Court decided that the charterers were under obligation to furnish the vessels safe berths at which they could load within a reasonable time and that, failing to do so, they were liable for demurrage under the provisions of the charter. We think this conclusion was correct. The vessels were chartered to carry cargoes of phosphate from Port Inglis to Europe and were detained from 2 to 3 weeks from the expiration of their lay days if computed as commencing 24 hours after the entry of the vessels at the custom house and notice of their readiness to receive cargo. To be more accurate, the Queenswood was delayed 14 days and 22 hours, the Homewood 13 days and 14¾ hours and the Moness 22 days and 3½ hours.

The respondents seek to escape liability for this admitted delay by the contention that the government had located two loading buoys at the so-called harbor of Port Inglis, which is eight miles from the coast, and that by the terms of the charters lay days did not begin to run until 24 hours after the vessels were actually anchored at one of these buoys and that the custom of the port required that vessels should take precedence at these two loading berths according to the date of their

entry at the custom house. In other words, it is argued, if the two loading berths were occupied by vessels having prior entry at the custom house, that the charterers could keep the chartered vessels idle for a week, a month or three months without incurring the slightest liability.

When the Queenswood, Homewood and Moness arrived November 16th, 28th and 30th, respectively, they anchored in 22½ feet of water, except the Homewood, which anchored in 22 feet. When loaded these vessels drew 20 feet, 17 feet 3 inches and 20 feet 3 inches, respectively, at their deepest point. As to the Homewood there can be no question that, allowing for the slight rise and fall of the tide, she had at least 4½ feet of water at all times under her keel. We fail to see, as to her, at least, how any excuse is established based upon insufficient depth of water. As to the other two it may be that when the loading had progressed to a point where there was but 2 or 3 feet of water under the bottom, it should have been suspended until the vessel was removed to a loading buoy or to a point further out where the water was deeper. This course, it appears, was frequently pursued in the case of deep draft vessels.

We fail to understand why the loading could not have been begun and continued so long as there was not the slightest danger of the vessels touching bottom. If the respondents' contention in this regard be well founded, it will apply to vessels drawing 10 feet as well as those drawing 20 feet when loaded. The former can be held in idleness at the will of the charterer although the danger from insufficient depth of water could by no possibility be a factor in the case. To illustrate: A. charters B.'s vessel, which draws 20 feet loaded, to proceed to a designated pier for a cargo of coal, the pier having 30 feet of water at its outer end and but 15 feet at its shore end. When the vessel arrives she finds the outer end of the pier occupied by another vessel and she immediately makes fast to the pier between this vessel and the shore end and notifies the charterer that she is ready to receive the cargo. Would the latter be justified in refusing to furnish it on the ground that she was not in a safe berth? On the contrary would it not be his duty to load her as fast as practicable and move her into deeper water to receive the remainder of the cargo as soon as the other vessel had vacated the berth at the end of the pier? We see no distinction in principle between the two cases. If the loading had proceeded as indicated it would at least have greatly reduced the time the vessels were delayed at the loading buoys. It is argued that it was unsafe for vessels to load elsewhere than at the loading buoys, and if they had done so and damage had resulted by reason of a storm the charterers might have been held liable. We are unable to see how such a contention can succeed. The master of each vessel having anchored and given notice that he was ready to receive the cargo, it is not easy to see how the charterers assumed the risk of damage to the vessel by complying with her master's request. The libelants could argue with even greater plausibility that if a storm had arisen and injured the vessels during the time they were improperly delayed, that the charterers were liable for the damage.

The testimony satisfies us that the loading could have proceeded at

the points where the vessels were anchored as safely as at the buoys. The Queenswood, for instance, had five anchors and her total anchorage weight was greatly in excess of that at the easterly buoy. We are constrained to believe that the refusal to load was not due to any apprehension of disaster but to the fact that the charterers did not have lighters enough and men enough to load more than two vessels at a time. The charter parties were executed on printed forms prepared by the respondents and each provides that the vessel shall proceed to the Port Inglis anchorage—

"or as near thereunto as she may safely get and there load. * * * The cargo to be brought along side and taken from along side free of risk and expense to the vessel, any custom of the port to the contrary notwithstanding. * * * Steamer or vessel to proceed to safe anchorage at port of loading indicated by the merchant and there load."

If there were nothing but the foregoing provisions to be considered it could not be contended for a moment that there was any obligation on the part of the vessel to anchor at a particular buoy. Her obligation was discharged when she reached a safe anchorage as near Port Inglis as she could safely get. She was then an arrived vessel and was entitled, after due notice, to "there load."

But it is argued that the clause dealing with the time lay days are to begin to run makes it clear that the "safe anchorage" of the preceding provisions is but a synonym for "loading buoy." The language relied on is as follows:

"The cargo to be supplied at the average rate of not less than 400 tons per weather working day * * * commencing 24 hours after vessel is in loading berth and is ready to receive cargo and written notice given to that effect."

We think the term "loading berth" as here used refers back to the safe anchorage previously provided for, to which the vessel was to proceed and where she was to load. The clause is to be construed as if it had provided that the cargo was to be supplied "24 hours after vessel is in safe anchorage, as aforesaid" or in "said anchorage" or "in said loading berth." The position most favorable to the respondents is that the charter is ambiguous and doubtful in this respect. Conceding, for the moment, this to be so, we think the doubt must be resolved against the charterers. They knew all the facts and were familiar with all the conditions and if they intended to require the vessels to reach one of the two buoys before lay days commenced to run they should have made their meaning so plain that the vessel owner could not have been misled. It may be doubted whether any prudent owner would have signed a charter containing such a provision.

It is argued that the libelants were bound by the custom of the port to load in turn at the two buoys. If the proof establishes a uniform custom, and this is not free from doubt, and if the vessel owners were aware of the custom, and this is by no means certain, such a custom would not override the express provisions of the charter party as we interpret it. We do not consider the relations of the respondents to the Port Inglis Terminal Company, the Dunnellon Phosphate Company and the other enterprises being developed at Port Inglis, further than as they show the general knowledge which the respondents had.

of the entire situation at that point. With such full information as to the capacity of the port for loading and unloading vessels, the respondents sent more vessels there than could be given reasonable dispatch and, in the circumstances, we think the damages due to the delay thus occasioned, should fall upon them rather than upon the vessel owners.

The decrees are affirmed with interest and costs.